Mathew D. Staver**
Horatio G. Mihet**
Daniel J. Schmid*
Avery B. Hill*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org
ahill@lc.org
*Attorneys for Plaintiffs*
**Motions for Admission *pro hac vice* forthcoming
*Admitted *pro hac vice*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

### Tucson Division

Daniel Grossenbach,

       Plaintiff,

v.

Arizona Board of Regents; Douglas
Goodyear, in his official capacity as
Chair of the Arizona Board of Regents;
The University of Arizona; Suresh
Garimella, in his official
capacity as President of the
University of Arizona,

       Defendants.

No. _____

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

*"Our nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. [T]he First Amendment . . . does not tolerate laws that case a pall of orthodoxy over the classroom."[1]*

For his Verified Complaint against Defendants, Arizona Board of Regents; Douglas Goodyear, in his official capacity as Chair of the Arizona Board of Regents; the University of Arizona; and Suresh Garimella, in his official capacity as President of the University of Arizona, Plaintiff Daniel Grossenbach alleges and avers as follows:

## INTRODUCTION

1.    Plaintiff, Daniel Grossenbach, is a Christian apologist and former ethics professor at the University of Arizona. Despite Plaintiff's reputation as a good professor, he was unceremoniously terminated by University leadership at the demands of internet trolls' intent on silencing his speech.

2.    When Professor Grossenbach was not working, or caring for his family, he was advocating for improvements to the Catalina Foothills School District ("CFSD") where his children attend school. CFSD became subject of public controversy over recent policies that promoted teachers secretly surveying children about their gender and sexuality, pushing radical gender ideologies upon those students, and unconscionably and intentionally keeping that information from parents.

3.    Despite the demands of parents in CFSD, including Professor Grossenbach, who saw the policies as a gross intrusion into their fundamental parental rights, obstinate school board members refused to

---

[1] *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (cleaned up) (emphasis added).

discuss this issue. This, despite the fact that the Supreme Court just recently confirmed that "[a] government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2342 (2025).

4.    During the course of the CFSD parents petitioning the school board to address the gross intrusion into their fundamental parental rights, an email surfaced from a middle school principal containing a list of students suffering from gender confusion. These students purportedly asked teachers to call them by pronouns inconsistent with their biological and chromosomal reality, but requested that teachers and officials conceal the request from their parents. After this email surfaced, Professor Grossenbach formed Save Catalina Foothills School Board ("SaveCFSD"), a non-profit organization focused on educating parents about school board policies and issues and fundamental parental rights.

5.    Professor Grossenbach was compelled by his sincerely held religious beliefs to form SaveCFSD, and he felt led by his religious convictions to urge parents to attend CFSD school board meetings for the purpose of petitioning the board to address this gross intrusion into parental rights.

6.    Anti-religious zealots turned digital critics connected over the issue in Facebook comments and bandied about to discuss a way to silence Professor Grossenbach and SaveCFSD.

7.    As is oft true of those determined to silence speech they do not like, the self-appointed digital censors settled on what they deemed the most effective method of silencing Professor Grossenbach—get him fired from his job.

8.    And that is what they went about doing, and in November 2023, the University obliged their demands.

9.    The self-appointed digital censors and anti-religious zealots took their complaints about Professor Grossenbach's speech and advocacy to his employer and lodged numerous anonymous complaints against Professor Grossenbach.

10.    After those anonymous complaints were filed, Professor Grossenbach was fired.

11.    Of course, knowing that basing its termination upon complaints targeting Professor Grossenbach for the exercise of his First Amendment rights is grossly unconstitutional and unlawful, Defendants provided a pretextual explanation for their actions. Defendants concocted the explanation that they had received funding for a full-time faculty member to take Professor Grossenbach's place as an adjunct professor and to teach his course in the Spring semester.

12.    As is prone to happen when explanations are plainly pretextual, Defendants' proffered justification did not happen. If Defendants received the purported funding, it was not spent on any full-time professor to teach Professor Grossenbach's course in the Spring because no one taught it. Despite being a graduate requirement for many the schools' students, the course was not offered so no one taught it.

13.    Moreover, contrary to its stated (*i.e.*, pretextual) justification for Professor Grossenbach's termination, the University posted advertisements soliciting resumes for additional adjunct professors to teach similar courses at the School of Government & Public Policy that Professor Grossenbach has been teaching for years.

14.   On January 26, 2024, less than 60 days after terminating Professor Grossenbach's employment, the department posted a position announcement for not just one, but two new adjunct instructors.

15.   The posting stated: The School of Government & Public Policy at the University of Arizona seeks two Limited Term Adjunct Instructors (part-time, non-tenure eligible, non-benefits eligible) for the Spring 2024 semester (course dates 03/11/24-05/01/24) with experience in teaching one or more of the following areas: public policy, political science, and criminal justice studies.

16.   These advertised positions were a fit for Professor Grossenbach's background, skills, and experience and were virtually identical to what he was already doing before Defendants terminated his employment on the pretextual basis that it was seeking a full-time instructor to cover his courses.

17.   In other words, Defendants were not even seeking to hire a full-time professor for Professor Grossenbach's courses as they had told him. Rather, Defendants were seeking an adjunct professor—who was not the target of an anonymous censorship campaign—to fill Professor Grossenbach's prior role.

18.   Based on the circumstances and timing of his termination, Professor Grossenbach suspected foul play was afoot and requested public records associated with Defendants' decision to not renew Plaintiff's teaching contract.

19.   Defendants unlawfully stalled Professor Grossenbach's public records request for 239 days, refusing to provide any records whatsoever that dealt with his unlawful termination.

20.    Professor Grossenbach was forced to seek legal counsel to intervene in his quest for public records, and to put a stop to Defendants' efforts to conceal their unlawful termination.

21.    "Sunlight is said to be the best of disinfectants." *Buckley v. Valeo*, 424 U.S. 1, 67 (1976). That proved true here, as responsive emails confirmed Professor Grossenbach's suspicions that there was more to the story of his termination.

22.    Indeed, responses and public records confirmed that Defendants terminated Professor Grossenbach shortly after receiving anonymous complaints about his religious speech, expression, and advocacy work with SaveCFSD and had internally placed a hold on his courses almost immediately after receiving those complaint.

23.    Professor Grossenbach, a Christian ethicist, has and maintains several sincerely held religious beliefs that are in direct conflict with Defendants' pro-Diversity, Equity, and Inclusion culture and political beliefs. Professor Grossenbach believes that parents have the right to direct the upbringing of their children. Professor Grossenbach also believes that God perfectly designed every person, making each of them either male or female since before their birth. Professor Grossenbach believes that attempts to depart from God's natural design of each unique individual as either male or female from before birth is sin. And, importantly, Professor Grossenbach has sincere religious convictions that whosoever knows the right thing to do and fails to do it, equally commits sin and brings upon himself eternal condemnation. Thus, Professor Grossenbach was compelled by his sincerely held religious beliefs and convictions to speak out against CFSD and protect his children.

24.    When Professor Grossenbach was expressing his views regarding parental rights at school board meetings, he was speaking on matters of public concern, engaged in constitutionally protected speech, religious expression, and religious exercise regarding his faith, morality, and the community. Defendants discriminated against Professor Grossenbach and retaliated against him because of his constitutionally protected speech, religious expression, and religious exercise.

25.    The anonymous complaints cited Defendants' actions as violative of several of Defendants' facially unconstitutional policies. One of the anonymous complaints alleged that Professor Grossenbach's actions violated the University's Nondiscriminatory and Anti-Harassment Policy (HR-200E) and its Statement of Professional Conduct (UHAP 7.01). To the extent Defendants contend that their conduct was necessitated and/or justified by these policies, both HR-200E and UHAP 7.01 are unconstitutional on their face and as-applied.

26.    Defendants unlawfully discriminated against Professor Grossenbach for exercising his faith, failed to even consider accommodating his beliefs, and stripped him of any due process rights associated with his employment at the University.

27.    Defendants' policies and practices of selecting, retaining, and terminating adjunct professors on the basis of their constitutionally protected religious speech, views, expression, and exercise, both on their face and as-applied, unconstitutionally discriminate on the basis of content and viewpoint.

28.    Defendants targeted Professor Grossenbach because of his sincerely held religious beliefs, speech, expression, and exercise for disparate and discriminatory treatment, and Defendants' policies, on their face and as

applied, target religion, and more specifically Professor Grossenbach's religious beliefs for disparate and discriminatory treatment.

29.    By punishing Professor Grossenbach for expressing his views regarding matters of public concern and his faith, Defendants retaliated against Professor Grossenbach for exercising his First Amendment right to free speech, religious expression, and religious exercise.

30.    Defendants' actions violate the Fourteenth Amendment right to equal protection under the law, as they singled out Professor Grossenbach, on the basis of his sincerely held religious beliefs, for selective, disparate, and discriminatory treatment.

31.    Defendants unlawfully denied Professor Grossenbach access to public records and failed to (and cannot) provide any legally sufficient rationale for waiting 239 days to disclose public records that they were under a binding legal obligation to disclose, which, as a matter of law, violates Arizona Revised Statutes §39-121.01 and §39-121.02.

32.    Defendants' unconstitutional policies and actions have caused Professor Grossenbach to suffer irreparable First and Fourteenth Amendment injuries and actual and concrete damages. Defendants' actions have inflicted irreparable damage to Professor Grossenbach's professional career and reputation, ended his academic pursuit of a doctorate degree, decreased his earning potential, and reduced his income. Further, when Professor Grossenbach was terminated, he lost a potential textbook publishing deal, furthering his financial loss and reputational damage.

33.    Defendants took these retaliatory actions to ensure Professor Grossenbach was unable to express his religious viewpoints, which the University found objectionable, despite the fact that Professor Grossenbach

engaged in the purportedly objectionable religious speech, exercise, and expression at a local government school board meeting.

34.    Defendants' actions are little more than a blatantly unconstitutional attempt "at keeping subversives out of the teaching ranks." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 602 (1967).

35.    America's universities are supposed to serve as the "marketplace of ideas," *id.* at 603, where students receive "wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues rather than through any kind of authoritative selection." *Id.*

36.    Defendants, instead, have sought to excise any such multitude of tongues in favor of silencing views it finds objectionable and making their classrooms little more than "enclaves of totalitarianism." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). The First Amendment knows no such compelled orthodoxy.

37.    Indeed,

The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Seeezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

38.    The Nation's universities, "if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction." *West Virginia Bd. of Education v. Barnette*, 319 U.S. 624, 637 (1943). Defendants, by contrast, have sought to excise undesirable creeds from their ranks and eliminate any instructors who dare espouse views that some hecklers in its community oppose.

39.    The First Amendment demands more, Title VII demands more, and so, too, should this Court.

## PARTIES

40.    Plaintiff, Daniel Grossenbach, is a citizen of the State of Arizona. From May 18, 2020, to November 30, 2023, Plaintiff served as an adjunct professor at the University of Arizona in Tucson, Arizona. Defendants terminated Professor Grossenbach's teaching contract on the basis of complaints lodged by anonymous online censors targeting his constitutionally protected speech regarding his sincerely held religious beliefs, in his private capacity, separate and apart from the workplace. Professor Grossenbach exhausted his administrative remedies by filing a charge of discrimination with the EEOC and obtaining a Notice of Right to Sue from the EEOC on May 27, 2025. A true and correct copy of Professor Grossenbach's Notice of Right to Sue is attached hereto as Exhibit A and incorporated herein. Plaintiff also authored the public records request submitted to Defendants on November 30, 2023, which was effectively denied by the University's untimely release of the subject records.

41.    Defendant, Arizona Board of Regents, is entrusted with control of Arizona's state universities. Under Arizona state law, Ariz. Rev. Stat. §15-1625, the Board of Regents is responsible for the coordinated governance of

Arizona's universities, is the ultimate authority of its personnel policies, practices, and decisions, and has the authority to sue and be sued.

42.    Defendant, Douglas Goodyear, is the Chair of the Arizona Board of Regents. Chair Goodyear leads the Board of Regents in their governance of Arizona's state universities, including the University of Arizona. Chair Goodyear is sued in his official capacity.

43.    Defendant, University of Arizona, is a land-grant university in the State of Arizona with authority to sue and be sued. The University of Arizona employed Professor Grossenbach until his unlawful termination.

44.    Defendant, Suresh Garimella, is the President of the University of Arizona, and is responsible for overseeing the adoption, implementation, application, and execution of the University of Arizona's policies and procedures, including those relevant to the employment of professors. President Garimella is sued in his official capacity.

## JURISDICTION AND VENUE

45.    This action arises under the First and Fourteenth Amendments to the United States Constitution and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and is brought pursuant to 42 U.S.C. §1983. This action also arises under federal statutory laws, namely 42 U.S.C. §1985(3) and 42 U.S.C. §2000e-2. This action also arises under Ariz. Rev. Stat. §39-121.01.

46.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§1331 and 1343, and has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.

47.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because this action arises in the district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

48.     This Court has the authority to grant the requested declaratory relief under the Declaratory Judgement Act, 28 U.S.C. §§2201-2202, implemented through Rule 57, Federal Rules of Civil Procedure.

49.     This Court is authorized to grant Plaintiff's prayer for permanent injunctive relief pursuant to Rule 54 of the Federal Rules of Civil Procedure and 42 U.S.C. §2000e-5.

50.     This Court is authorized to award the requested damages pursuant to 42 U.S.C. §1983 for the deprivation of rights, privileges, and immunities in an action at law.

51.     This Court is authorized to grant Plaintiff's prayer for damages, back pay, and reinstatement under Title VII of the Civil Rights Act, 42 U.S.C. §2000e-5.

52.     This Court is authorized to grant Plaintiff's prayer for costs and attorney's fees, pursuant to 42 U.S.C. §1988 and 42 U.S.C. §2000e-5(k).

## GENERAL ALLEGATIONS

### A.     Professor Grossenbach's sincerely held religious beliefs.

53.     Professor Grossenbach served as an adjunct professor at the University of Arizona from May 18, 2020, to November 30, 2023.

54.     Professor Grossenbach is a Christian, father, ethicist, and Christian apologist. The University of Arizona hired Professor Grossenbach to teach ethics classes at the School of Government & Public Policy, at least in part because of his ethics background in Christian apologetics.

55.     As a Christian, Professor Grossenbach is committed to his sincerely held religious beliefs. Among those beliefs is Professor Grossenbach's unshakable conviction that Scripture is the word of God, thus perfect, infallible, and instructive for our lives on earth.

56.     Professor Grossenbach has sincerely held religious beliefs, rooted in the authority of Scripture, that: "Above all, you must understand that no prophecy of Scripture came about by the prophet's own interpretation of things. For prophecy never had its origin in human will, but prophets, though human, spoke from God as they were carried along by the Holy Spirit." *2 Peter* 1:20-21 (NIV).

57.     King Solomon, often regarded the wisest man who ever lived, emphasized the infallibility of Scripture in the Book of Proverbs: "Every word of God proves true; he is a shield to those who take refuge in him. Do not add to his words, lest he rebuke you and you be found a liar." *Proverbs* 30:5-6 (ESV).

58.     In the Second Epistle of Timothy, Apostle Paul reminds Timothy, that "[a]ll scripture is breathed out by God and profitable for teaching, for reproof, for correction, and for training in righteousness, that the man of GOD may be complete, equipped for every good work." *2 Timothy* 3:16-17 (ESV).

59.     Professor Grossenbach, in accordance with *Psalm* 119, sincerely believes that he must rely on Scripture to guide his path and decision making: "Your word is a lamp to my feet, a light to my path." *Psalm* 119:105 (NIV).

60.     Professor Grossenbach also has the sincerely held religious belief that silence in the face of evil is evil itself. *See James* 4:17 (NIV) ("If anyone, then, knows the good they ought to do and doesn't do it, it is sin for them.")

61.     Additionally, Professor Grossenbach believes that here is "a time to tear and a time to mend, a time to be silent and a time to speak." *Ecclesiastes* 3:7 (NIV). Professor Grossenbach sincerely believes that he is compelled by Scripture to speak up against immoral acts occurring in his presence.

62.    Professor Grossenbach has sincerely religious beliefs that the Book of Genesis perfectly describes God's creation of human beings. This includes God's determination that humans are either male or female before their birth: "So God created mankind in his own image, in the image of God he created them; male and female he created them." *Genesis* 1:27 (NIV).

63.    Professor Grossenbach has sincere religious beliefs that *Psalm* 139 confirms that we were all born as God intended: "You made all the delicate, inner parts of my body, and knit me together in my mother's womb." *Psalm* 139:13 (NLTCE).

64.    Professor Grossenbach has sincere religious beliefs that departing from God's natural design is sin. The Book of Deuteronomy strictly prohibits dressing as the opposite sex: "A woman must not put on men's clothing, and a man must not wear woman's clothing. Anyone who does this is detestable in the sight of the LORD your GOD." *Deuteronomy* 22:5 (NLTCE). Thus, Professor Grossenbach has sincere religious beliefs, grounded in Scripture, that if an individual's dresses as the opposite sex, they depart from God's natural design and commit sin.

65.    In accordance with Scripture, Professor Grossenbach believes that any child "identifying" as any gender other than their birth gender is a sign of mental illness that must be promptly reported to the child's parents so that they can seek medical, mental, and spiritual care for the well-being of the child.

66.    In pursuit of a righteous life, and in accordance with the word of God, Professor Grossenbach has dedicated much of his life to the study of Scripture, ethics, morality, and philosophy. Professor Grossenbach does not just theorize about "right" and "wrong," he attempts to live his life for the benefit of his neighbors. *See John* 15:13 (NIV) ("Greater love has no one than

this: to lay down one's life for one's friends."). This pursuit requires that Professor Grossenbach advocate for parental rights, including parental access to their minor children's mental health information.

67. Professor Grossenbach's pursuit of what is right in the eyes of the Lord, led to his founding of SaveCFSD, a non-profit organization that advocates for truth, trust, and transparency within Catalina Foothills School District 16.

**B.  Professor Grossenbach founded SaveCFSD, a parental rights and advocacy group, to petition CFSD's board concerning its policies and practices of hiding minors' mental health information as a violation of fundamental parental rights.**

68. Professor Grossenbach founded SaveCFSD after an email surfaced from a middle school principal in CFSD confirming that the district was violating fundamental parental rights and hiding information to which the parents are owed disclosure.

69. The email contained a list of students suffering from gender confusion, who had asked teachers to call them by chosen pronouns inconsistent with their biological and chromosomal reality, but requested that the school conceal this information from the parents.

70. Professor Grossenbach and SaveCFSD urged parents to attend CFSD school board meetings to advocate that the school board address its policies and practices of concealing student information in gross violation of their fundamental parental rights.[2]

---

[2] Tina Giuliano, *Concerned parents gather at Catalina Foothills School District board meeting*, ABC 9 KGUN Tucson (April 5, 2023), *available at*

71.     Despite Professor Grossenbach's and SaveCFSD's pleas, the school board refused to address this significant concern, ignoring hundreds of parents' requests and canceling a school board meeting to avoid the controversy.

72.     The school board canceled its April 25, 2023, meeting citing threats of violence.[3] There were no threats. The school board was reacting to social media comments noting that parents were "comin' in hot" to the school board meeting. The school board latched onto the phrase "comin' in hot" as a threat. The context of the message and its public nature makes clear it was not a threat but rather a euphemism for parents coming in to advocate and petition for changes to CFSD policies and practices that were running roughshod over their fundamental parental rights.

73.     SaveCFSD responded to the canceled meeting by raising $2,000 and hosting a "Comin' in Hot Pizza Party!" outside the entrance of the school board meeting.[4]

74.     More recently, SaveCFSD and its members advocated against the removal of armed law enforcement at schools, requiring textbook selection meetings be opened to the public, and the implementation of policies that require teachers inform parents if their children show signs of mental

---

http://kgun9.com/news/local-news/concerned-parents-gather-at-catalina-foothills-school-district-board-meeting.

[3] Anne Simmons, 'Threats of violence' cancel Catalina Foothills School District Board Meeting, ABC 9 KGUN Tucson (April 23, 2023), *available at* https://www.kgun9.com/news/local-news/threats-of-violence-cancel-catalina-foothills-school-district-board-meeting.

[4] Kate Anderson, School District Files Report With FBI Over Alleged 'Threats' After Parents Criticize Transgender Locker Room Policy, Daily Caller (May 9, 2023), *available at* https://dailycaller.com/2023/05/09/school-district-fbi-trans-policies-online-threats/.

illness in class. Signs of mental illness include children requesting to be referred to by pronouns that do not match their God-given, birth gender.

75.    All of Professor Grossenbach and SaveCFSD's request were well-founded and grounded in fundamental parental rights. Indeed, all of their requests were just recently confirmed by the Supreme Court of the United States to be required of school boards. *See Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025) (holding that school board policies of withholding educational information about students in the district violated fundamental parental and First Amendment rights of parents).

## C.    Online agitators targeted Professor Grossenbach and caused his termination.

76.    "If there be time to expose through discussion the falsehoods and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 273 U.S. 357, 377 (1927). Indeed, "[i]f there is a concern about principled, decent, and thoughtful discourse in [political matters], the First Amendment provides the answer. *That answer is more speech*." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 476 (2015) (Kennedy, J., dissenting) (emphasis added).

77.    Contrary to that unequivocal answer provided by the First Amendment, self-appointed thought police on the internet set out to dispel Professor Grossenbach's message, advocacy, and speech by compelling Defendants to silence him and deprive him of the benefits of polite society.

78.    Such agitators found each other on social media (Facebook) and publicly devised a plan to file complaints with Professor Grossenbach's employer with the express purpose of making sure Defendants terminated Professor Grossenbach's employment.

79.    Defendants acquiesced, and the trolls succeeded.

80.    The first complaint by the online agitators was filed on May 9, 2023. The following email was sent to an undisclosed faculty member at the University of Arizona:

Please be aware that one of your professors, Dan Grossenbach, is the leader of an anti-gay hate group. The group CFSD ConcernedCitizens [later renamed SaveCFSD] (on Facebook) has been brought to light by disrupting Catalina Foothills School District CFSD16 Board Meetings. Recently, it was revealed that his threats against the school board and his group's actions have been presented to PCSD and the FBI for potential domestic terrorism actions. He is currently teaching a course entitled PA330 "Ethics for the Public Administrator.

A true and correct copy of the May 9 complaint is attached hereto as Exhibit B and incorporated herein.

81.    It is unclear why the name of the faculty member is undisclosed.

82.    To state the obvious, the so-called "domestic terrorism" of which Professor Grossenbach was falsely accused was his political and religious speech at a public meeting of the government school board that the complainers deemed "anti-gay hate." Exhibit B at 1.

83.    Professor Grossenbach's speech, petitions, and advocacy to the school board ranged from 2-to-3-minutes, were all pre-written speeches, and solely focused upon CFSD's violation of parental rights. There was nothing "anti-gay" about them, nor did any of his public comments, speech, and advocacy include anything hateful.

84.    The speeches are publicly available online for Defendants to view and review.

85.    The initial complainant followed up with a second email: "Here are some more screenshots from [Plaintiff's] interactions with the public. The following is a link to the group on Facebook that Dan runs." Exhibit B at 1.

86.    That same day Edella Schlager, Director of the University of Arizona School of Government & Policy, forwarded both of complainant's emails to Kirssa Cline, Alex Braithwaite, and Angela Hackett, other faculty members at the University's School of Government & Public Policy. *Id.*

87.    Ms. Schlaeger forwarded the complaints with no additional comment.

88.    The reason no further comments were included in the public records was subsequently revealed to be that Defendants' faculty and staff were discussing these complaints in person, rather than through email, presumably to avoid public records laws.

**D.    CFSD found itself drawn deeper into controversy as the Arizona Superintendent took aim at its policies, and Professor Grossenbach continues his advocacy.**

89.    In the Fall of 2023, CFSD found itself at the center of escalating controversy regarding its decision to withhold critical mental health information from parents.

90.    In June 2023, Arizona Superintendent Tom Horne held a press conference where he addressed the leaked email of a list of gender confused students and the school's decision to withhold that information from the parents.[5]

---

[5] Chorus Nylander, N4T Investigators: Local school district pushes back after State Superintendent comments, News 4 Tucson KVOA (June 13, 2023), *available at* https://www.kvoa.com/news/n4t-investigators-local-school-district-pushes-back-after-state-superintendent-comments/article_55b5a7f0-0a35-11ee-9b98-9767def278fb.html.

91.     Professor Grossenbach, as a member of SaveCFSD and father of children in the district, spoke at several more school board meetings. Professor Grossenbach discussed the abhorrent practice of teachers presenting inappropriate sexual content to elementary and middle school students and discussed the unlawful promotion of gender fluidity in schools.

92.     Professor Grossenbach continued his objections and advocacy to CFSD's mandate that required teachers withhold student elected pronouns from parents.

93.     As alleged more fully *supra*, Professor Grossenbach's speech, objections, and advocacy arise from his sincerely held religious beliefs.

94.     Professor Grossenbach spoke at the June 27, 2023, CFSD board meeting. Professor Grossenbach began his public comments and advocacy, as he routinely did, with the disclaimer that he was speaking on behalf of himself and not speaking on behalf of the University where he is employed. He made sure to state that he was speaking as a parent of two students in the district.[6]

95.     Professor Grossenbach provided this same disclaimer before his other school board speeches.

96.     Later that summer, Professor Grossenbach and SaveCFSD hosted the Southern Arizona Values in Education (SAVE) 2023 Conference to discuss the many issues facing CFSD and plan a way to restore the district's public education.

---

[6] Professor Grossenbach's comments to the CFSD board, June 27 Comments, *available at* https://www.youtube.com/watch?v=GcLh7zkMKbM&t=3s, which are incorporated herein by reference.

97.    Enter the Pima County Democratic Party, which began targeting Professor Grossenbach and SaveCFSD on the basis of their constitutionally protected speech, religious expression, and religious exercise.

98.    On August 4, 2023, the Pima County Democratic Party re-posted a SAVE 2023 advertisement with the comment: "MAGA, extremist PAC recently formed in an attempt to wholly alter the Catalina Foothills School District is having this hate "conference" on Saturday – sign up and respectfully tell them that HATE is not welcome at CatFoot."[7]

99.    A commentor added, "Put on by Dan Grossenbach hiding behind SaveCFSD or CFSDConcerned Citizens," and another agitator proclaimed on the comment, "No Tolerance."[8]

100.    That same day, the Pima County Democratic Party posted about SaveCFSD again, this time linking the SaveCFSD website and stating, "The MAGA, Extremist, anti-everything PAC recently forced in an attempt to wholly alter the Catalina Foothills School District and install radicalized Evangelical School Board members – with no children in the district – has created this ridiculous website."[9]

101.    The fury of posts targeting Professor Grossenbach and SaveCFSD continued throughout August 2023.

---

[7] Pima County Democratic Party, *MAGA, extremist, PAC recently formed in attempt to wholly alter the Catalina Foothills School …*, Facebook (August 4, 2023, 11:31 AM), *available at* https://www.facebook.com/pimadems/posts/pfbid02FkbPeLggiJbkjvyb7bix7F aeP2qRJk734VyvT4T2vv79LZwp4Rh3cQma9YMM5UF2l.

[8] *Id.*

[9] Pima County Democratic Party, *The MAGA, extremist, anti-everything PAC recently formed in an attempt to wholly alter the Catalina …*, Facebook (August 4, 2023, 11:15 AM), a*vailable at* https://www.facebook.com/pimadems/posts/pfbid037bGy6kmHj6xZQ2PfPM VVdTstMxmN8XS3qwjDc61bmJNfebEdX6crQMdXe2Wjfaqpl.

102.    On August 9,[10] 14,[11] and 27,[12] the Pima County Democratic Party posted about SaveCFSD. The August 14, 2023, post specifically targeted Professor Grossenbach for his protected speech, religious exercise, and religious expression, stating: "Professor Grossenbach is of the new breed of 'Christian Apologists' who are distinguished by their focus on monetizing hyperbolic lies about children, public schools and teachers."[13]

103.    The post continued, "For all committed to a separation of Church and State – know that extremists like Professor Grossenbach would like nothing better than to force their religion on all of us and replace the Rule of Law, with his distorted, bigoted and violent version of Christianity."[14]

104.    SaveCFSD's website and literature is referred to as a "cesspool of hatred, and lies about children, teachers and our public schools."[15]

---

[10] Pima County Democratic Party, *Our School Boards, and our schools are not places radicalized extremism belongs. …*, Facebook (August 9, 2023, 8:16 PM), *available at* https://www.facebook.com/pimadems/posts/pfbid0E97QsKAsJJvmuGxHSGVvkPgsqCU8sZycHip7XwRdCfjSEEKPUnniXsriXUaqGgzBl.

[11] Pima County Democratic Party, *To our community – "PCDP recently received outreach from Dan Grossenbach. Professor Grossenbach is …*, Facebook (August 14, 2023, 2:02 PM), *available at* https://www.facebook.com/pimadems/posts/pfbid037o54SeGwzYKZjZ236sJVuKe59pu275m8tNsGLciQHgrMKr5R8jisANajh5AJFWHnl.

[12] Pima County Democratic Party, *This is clear harassment of our teachers – When will this violent extremism stop? If you are …*, Facebook (August 27, 2023, 12:48 PM), *available at* https://www.facebook.com/pimadems/posts/pfbid02hmzBPQsoi6YmiQhZoQ643yTSkfaXf5rmYYbo9PgnHjm11pmXNYaTtwEU3EwoBPjkl.

[13] Pima County Democratic Party, *To our community – "PCDP recently received outreach from Dan Grossenbach. Professor Grossenbach is …*, Facebook (August 14, 2024, 2:02 PM), *available at* https://www.facebook.com/pimadems/posts/pfbid037o54SeGwzYKZjZ236sJVuKe59pu275m8tNsGLciQHgrMKr5R8jisANajh5AJFWHnl.

[14] *Id.*

[15] *Id.*

**E.      SaveCFSD received and shared a copy of CFSD's Student Pronoun Surveys furthering tensions between the school board and concerned parents.**

105.    SaveCFSD acquired a copy of an official CFSD Student Pronoun survey, which explicitly elicited sexual information from children.

106.    CFSD's board remained steadfast in its obstinance, refusing to address parental concerns about this matter, heightening tensions in the school district, and further endangering children, including Professor Grossenbach's children.

107.    On September 2, 2023, Professor Grossenbach, compelled by his sincerely held religious beliefs to protect his children and the children attending CFSD schools, shared a copy of the survey online.

108.    The survey, given to students by a teacher, contained the following questions:

Name:

Name you want me to call you:

Pronouns (ex: he/him/his, she/her/hers, they/them/theirs):

May I use these pronouns in front of the class?

May I use these pronouns when I contact home?

May I use these pronouns in front of other teachers?

Would you like me to follow up (in a private conversation) about your pronouns?

Tell me three things about yourself. This could be interesting facts, hobbies, or just things you want me to know about you. Use the back of the paper if needed.

A true and correct copy of the CFSD Pronoun Survey is attached hereto as Exhibit C and incorporated herein.

109. As objectionable as CFSD's secret solicitation of sexual information from minors was, it was actually one of the least objectionable surveys CFSD provided to its students.

110. Other CFSD student surveys went so far as to ask minor children about their sexual desires and preferences.

111. Numerous parents contacted teachers, principals, and the schoolboard, concerned about the surveys, the continued promotion of gender fluidity, and teachers' discussion of sex with minor children.

112. Neither CFSD nor any of its officials or employees corrected the parents' complaints and sought, instead, to explain why CFSD believed its surveys were permissible. In fact, CFSD informed some parents in the district that the unconscionable "surveys" provided to students in the district without their parents' knowledge or consent, was not a survey at all so it did not violate any policies or laws.

113. Despite parents' complaints, CFSD continued providing its students the objectionable surveys against parents' wishes, and the practice continued despite its gross intrusion into fundamental parental rights.

114. Plaintiff sought a response from the CFSD board, in person, at a CFSD board meeting.

115. His statement was entirely dismissed by the school board. The public comment, in its totality, is below:

> The big controversy brewing in this district is not about pronouns and it's not about bathrooms. The big controversy is about all five board members approving the ongoing practice of concealing important student information from their parents. Now this survey that was sent out this last couple of weeks (one of many) is a stark reminder of how this practice has been consistent over the last few years. Two years ago

Orange Grove Middle School principal Mark Rubintoles blasted out a list of ten student names to instruct his staff not to tell the parents of those kids something personally important about their Mental Health and I've been fortunate enough to be face to face with some of those parents and I see real sadness in their eyes like real trauma not because of pronouns and not because of bathrooms. It is because of a real deep sense of betrayal. They have been hurt, and they've been lied to. They've still, they've all confirmed with me (all the ones I talked to), they still – this information has been withheld from them and so I'm coming to you now, not with an agenda item, but to ask a procedural question. Is there anything procedurally that would stop you or prevent the board from discussing at the next meeting, a policy to stop hiding important student information from their parents? Mrs. Mehmert, do you know of anything that would stop, procedurally?[16]

116.    Several parents followed Plaintiff, also speaking out against the School Board's policies which allow teachers to elicit students' elected pronouns, and further allow teachers to conceal this information from parents.

117.    This was the sixth CFSD meeting in which numerous parents showed up to speak out against CFSD's failure to address this issue.

118.    Over 200 parents attended the first meeting, filling the room past its recommended capacity.

119.    CFSD attempted to suppress the controversy by limiting attendance at the second meeting.

---

[16] CFSD Governing Board Public Comments 2023 09 12, *available at* https://www.youtube.com/watch?v=RI91cnGuU_s&t=617s023 09 12

120.    Despite the limits, hundreds of parents gathered outside of the building where the meeting was being held.

121.    The crowd waiting in line to attend the CFSD board meeting in person was so vast that it circled the building with many parents and community members waiting over an hour before being turned away for a purported lack of seating capacity. The parents streamed the meeting online from outside.

**F.    Online trolls again took aim at Professor Grossenbach, submitting a second anonymous complaint to the University.**

122.    On October 12, 2023, another anonymous individual submitted a complaint to Professor Grossenbach's supervisors, griping about his advocacy to the board. The complaint reads:

To whom this may concern –

I am a parent of a student at Catalina Foothills High School. I regularly watch the school board meeting recordings, and I am appalled by the speech of this man, his family, and the groups that he supports, who I have recently learned is employed by the University of Arizona. He consistently spews misinformation about children who belong to the LGBTQ community, anyone who votes anything other than republican, and those who do not belong to a Christian church.

My oldest child is a member of this community, attending Catalina Foothills, and had plans to attend the U of A next year. Since the U of A employs someone who repeatedly states that my child should not exist, I am finding it difficult to allow my child to attend the U of A.

I hope that you will look into this faculty member's public words and make the right choice for Arizona and its future students.

1    Thank you.

2    Concerned Parent.

3    A true and correct copy of the October 12, 2023 complaint is attached hereto

4    as Exhibit D and incorporated herein.

5    123.  A mere 12 minutes after the above complaint was submitted to

6    Defendants, online malcontents took to social media to discuss ways to get

7    Professor Grossenbach fired from his job. The following conversation took

8    place on Facebook:

9    [Speaker 1]:    If he had any shame hed [sic] realize we don't

10                   tolerate his brand of fear mongering.

11                   But he doesn't.

12                   Side note; I think it should be known to the group

13                   that hes [sic] an adjunct professor at u of

14                   Don't know if I can continue to support my alma

15                   mater with people like him on the teaching staff.

16   [Speaker 1]:    A u of a. Grrrr.

17   [Speaker 2]:    [Speaker 1] what if we all contacted his supervisors,

18                   the way he does when teachers supports [sic]

19                   marginalized communities.

20   [Speaker 3]:    [Speaker 1] from what I understand he teaches an

21                   online night course. Of course, this could have

22                   changed from what I last learned but I do think his

23                   connection to the UA as an adjunct professor is

24                   inflated.

25   [Speaker 1]:    [Speaker 3] well there's no professor reviews of him.

26

27

28
                                26

A true and correct copy of the Facebook comments directed against Professor Grossenbach on October 12, 2023 is attached hereto as Exhibit E and incorporated herein.[17]

124. On October 13, 2023, Kimberly Rogan, Program Manager for Faculty Affairs in the Office of the Provost, forwarded the complaint to Andrea Romero, Vice Provost of Faculty Affairs, with the following message:

> Hi Andrea,
>
> I wanted to touch base with you on how to best respond to the community member who emailed the Faculty Affairs inbox below.
>
> For the background, this faculty member in question was a Limited Term Adjunct Instructor in the School of Government and Public Policy, employed between 5/18/2020 and 5/15/2023. According to UAccess, [redaction.[18]]
>
> Thank you,
>
> Kim

Exhibit D at 2.

125. A few minutes later, Vice Provost Romero forwarded the above email and complaint to Edella Schlager:

> Edella,
>
> I am just forwarding this email about an adjunct who was teaching in your unit. I am not requesting action- just fyi. Let me know if you so want to discuss.

---

[17] Though not afforded the same treatment and respect by the online commenters, Professor Grossenbach has redacted the names of the individuals who posted comments against him to safeguard their privacy and protect them from any retribution.

[18] The remainder of this email was unlawfully redacted from the public records disclosed to Plaintiff.

1    Andrea

2  Exhibit D at 2.

3    126.  Dr. Schlager forwarded the email to her assistant with the

4  message, "Let's discuss this next week." Exhibit D at 1.

5    127.  Faculty Affairs responded to the "concerned parent" with the

6  following message:

7    Dear Concerned Parent,

8    My name is Kim, and I am the Program Manager for Faculty Affairs in

9    the Office of the Provost.

10    Thank you for taking the time to let us know about these concerns.

11    Please know that I have forwarded your concerns to the appropriate

12    individuals within University leadership. If there are any questions,

13    we may be reaching out to you for additional information or

14    clarification.

15    With appreciation

16    Kim

17  A true and correct copy of Manager Rogan's response is attached hereto as

18  Exhibit F and incorporated herein.

19    **G.  Defendants conversed about this "issue," meaning**

20      **Professor Grossenbach's constitutionally protected**

21      **speech, in staff emails, Zoom conversation, and an**

22      **"Informal Chat" noting, "this issue will take care of itself."**

23    128.  On October 19, 2023, Professor Grossenbach's supervisor

24  responded, "This fell off my radar- would you like to have a quick zoom with

25  Alex and maybe Kirssa to discuss this?" Exhibit D at 1.

26

27

28
                            28

129. Ms. Schlager responded, "Why don't me, you, and Alex have an informal chat. As Alex mentioned if we have a successful search for the Kanbay Chair this issue will take care of itself." Exhibit D at 1.

130. The "issue" Defendants' officials were discussing was Professor Grossenbach's protected speech and advocacy, and "taking care of itself" was of course removing Professor Grossenbach from his employment without having to terminate him.

**H.     Defendants received a third anonymous complaint, encouraging Defendants to discipline Professor Grossenbach pursuant to the University's unlawful standards and policies regarding gender identity and discrimination.**

131. On October 28, 2023, another individual submitted an anonymous complaint about Professor Grossenbach, this time encouraging Defendants discipline Professor Grossenbach in accordance with the University's standards and policies regarding "respectful discourse," misgendering students, gender identity, and sexual orientation:

Dr. Edella Schlager

Director, School of Government and Public Policy

Social Sciences, Rm. 317

Tucson, AZ 85721

Dear Dr. Schlager,

I am writing to make you aware of the unethical behavior of Dan Grossenbach, an adjunct faculty member at the School of Government and Public Policy at the University of Arizona. I believe that this behavior violates the principles of the SGPP and it creates a hostile environment for transgender and LGBTQ students, in particular.

As an administrator of the Facebook and X accounts Save CFSD, Professor Grossenbach has:

- Referred to transgender females as 'male students'/'male perverts' and to all transgender individuals as 'mentally ill' in his social media posts.
- Posted articles with headlines and captions about 'LGBT thugs' and 'Satan respects pronouns.'
- Tagged Charlie Kirk of Turning Point USA, Libs of TikTok, Moms for Liberty and other extremist hate groups. (As you are probably aware, members of Turning Point USA recently harassed and assaulted a professor of LGBTQ studies at ASU.)
- Spread false information about children being 'indoctrinated' by public school administrators to become transgender.
- Intentionally commingled funds from named and anonymous sources and presented those funds as his own for the purposes of establishing a partisan political action committee (on X, see @KennyJacobs thread of tweets from 8/4/23, posted below)

This is simply the tip of the iceberg. More examples of unethical conduct are readily available on his Save CFSD social media accounts on X, YouTube, and Facebook. Please note that there are two Save CFSD Facebook pages, an older personal one and a new business one. He is the administrator of both.

This behavior falls well short of meeting the University's standards for engaging in respectful discourse. Instead, this language not only misgenders and denigrates transgender students, but it also undermines the rights that should be afforded to all LGBTQ students at the University. Such derogatory and discriminatory language

perpetuates a hostile and unwelcoming atmosphere that can have a negative impact on the mental and emotional well-being of students.

Beyond that, this behavior goes against the University's Statement on Professional Conduct, which seeks to provide an inclusive and respectful environment for all students, regardless of their gender identity or sexual orientation.

Would any student want to learn public administration ethics from a faculty member who writes and shares posts that preach hate and discrimination? Or who knowingly spreads misinformation and mishandles funds?

I appreciate your commitment to upholding the principles of the University and of your faculty's professional conduct. I trust that you will take the necessary steps to address this complaint and ensure a more inclusive, ethical and respectful educational environment for all its students.

Thank you for your attention to these matters. I wish to remain anonymous as out of fear of retaliation from this individual and his followers. Please review the attached evidence.

A true and correct copy of the October 28 complaint is attached hereto as Exhibit G and incorporated herein.

132.    Shortly after receiving the email, Dr. Schlager forwarded it to Alex Braithwaite, Director of the School of Government & Public Policy, and Angela Hackett, Assistant Director of the School of Government & Public Policy.

133.    One of the policies referenced in the October 28 complaint is Defendants' "Nondiscrimination and Anti-Harassment Policy" – Policy Number HR-200E. The policy provides:

The University of Arizona is committed to creating and maintaining an environment free of discrimination. In support of this commitment, the University prohibits discrimination, including harassment and retaliation, based on a protected classification, including race, color, religion, sex (including pregnancy), national origin (including shared ancestry and ethnic characteristics), age, disability, veteran status, sexual orientation, gender identity, or genetic information. The University encourages anyone who believes they have been the subject of discrimination to report the matter immediately as described in the section below," Reporting Discrimination, Harassment, or Retaliation." All members of the University community are responsible for participating in creating a campus environment free from all forms of prohibited discrimination and for cooperating with University officials who investigate allegations of policy violations.

A true and correct copy of University of Arizona's HR200E policy is attached hereto as Exhibit H and incorporated herein.

134.    HR-200E provides that, if a complaint is alleged, Defendants are obligated to "take prompt and appropriate action to (a) thoroughly investigate complaints of discrimination described in this Policy; and (b) prevent, correct, and, if necessary, discipline individuals who engage in behaviors that violates this Policy." Exhibit H at 1.

135.    The other policy referenced in the October 28 complaint is Defendants' "Statement on Professional Conduct," referred to as policy number UHAP 7.01, which states:

We do not tolerate discrimination, harassment, or behavior that intimidates, threatens, demeans, or harms another person. We work to resolve differences constructively, look out for each other and promptly

address or report issues of concern. We recognize our individual obligation to make the University a safe and inclusive environment by abiding by the University's Workplace Violence policy and Nondiscrimination and Anti-Harassment Policy.

A true and correct copy of University of Arizona's HR200E policy is attached hereto as Exhibit I and incorporated herein.

136. UHAP 7.01 also provides, "We are committed to freedom of expression, academic freedom, and collaborative inquiry," and "[w]hile we may not always agree with the ideas and opinions of others, we honor their right to express them."

137. Needless to say, Defendants did not honor Professor Grossenbach's ideas and opinions. They fired him for expressing them.

**I.    Professor Grossenbach was terminated during a zoom call originally scheduled to discuss an ethics textbook publishing deal that would have furthered Professor Grossenbach's academic and professional career and reputation.**

138. In November 2023, a publisher approached Professor Grossenbach to author a college textbook about ethics. Professor Grossenbach, in hopes of furthering his academic and professional careers, the reputation of the University, and in preparation for plans to obtain a Doctorate, was very interested in writing the textbook. He sought approval from the University before engaging further with the publisher.

139. On November 20, 2023, Professor Grossenbach informed Angela Hackett about the opportunity to author the ethics textbook and requested a meeting to discuss the logistics of putting together a team of professors for the task. Professor Grossenbach email to the Assistant Director states:

1      Hi Angela.

2      I've been approached by a publisher about authoring a textbook for PA

3      ethics for potential use in PA330.

4      Do you know how many students take PA330 each year (or semester)

5      on average?

6      Other than Dr. Polakawski, Stuart Brody, and I, which other

7      instructors have taught this class over the last couple years? I may

8      want to reach out to them about possible collaboration.

9      I thought this course was cross listed with a sister Political Science

10     course but can't see that in the catalog description. Do you know the

11     cross-listings or if another department has the same class?

12     Happy Thanksgiving week!

13     Dan.

14 A true and correct copy of Professor Grossenbach's email and corresponding

15 responses is attached hereto as Exhibit J and incorporated herein.

16     140.  On November 20, 2023, at 12:03pm, the Assistant Director sent

17 an email to Dr. Schlager:

18     Hello Beth,

19     I just received this email and I am not entirely sure how to respond. We

20     likely won't invite him back to teach, correct? The plan is for the new

21     Kanbay Chair to teach the ethics courses in the future?

22     Any advice would be greatly appreciated

23     Angela L. Hackett, MPA

24     Assistant Director

25     School of Government & Public Policy

26     University of Arizona

27     ahackett@arizona.edu

28

1    520-621-7602

2    The University of Arizona is a Hispanic-Serving institution which

3    resides on the traditional territory of the Tohono O'odham and Pascua

4    Yaqui peoples.

5  Exhibit J at 1.

6    141.   At 12:09pm, Ms. Schlager responded, "If you wouldn't mind, why

7  don't you set up a meeting with Dan before the end of the semester so that I

8  can share the news with him." Exhibit J at 1.

9    142.   On November 20, 2023 at 12:16pm, Defendants set up a meeting

10 with Defendants, under the guise that they would be discussing the textbook

11 publishing deal. Instead, the plan was to inform Professor Grossenbach his

12 teaching contract would not be renewed, effectively terminating him from the

13 University. Ms. Hackett responded to his email:

14    Hi Dan,

15    I hope you are doing well- and Happy Thanksgiving to you and your

16    family.

17    I think it might be best for you to chat this through with Edella because

18    I don't really know the answers to your questions and I don't want to

19    mis-advise you. She said she'd be happy to meet with you. She said

20    she'd be happy to meet with you.

21    Below are some times/dates that work for Edella's schedule – Do any of

22    these times/days' work for you for an in-person or zoom meeting next

23    week?

24    • Monday, Nov 27          11:30am-1:30pm

25    • Tuesday, Nov 28          11am-2pm

26    • Wednesday, Nov 29       9am

27    • Thursday, Nob 30         9-11am

28

1    • Friday, Dec 1        any time after 12 noon

2    Thanks,

3    Angela L. Hackett, MPA

4    Assistant Director

5    School of Government & Public Policy

6    University of Arizona

7    ahackett@arizona.edu

8    520-621-7602

9    The University of Arizona is a Hispanic-Serving institution which
10   resides on the traditional territory of the Tohono O'odham and Pascua
11   Yaqui peoples.

12   A true and correct copy of Ms. Hackett's email is attached hereto as Exhibit
13   K and incorporated herein.

14       143.   On November 30, 2023, Professor Grossenbach joined a zoom call
15   with Dr. Schlafer expecting to discuss his potential textbook deal. Instead,
16   Dr. Schlager informed Professor Grossenbach that the University would not
17   be renewing his teaching contract, terminating him from his role at the
18   University and ending his prospects of authoring an ethics textbook.

19       144.   Defendants' stated rationale for this decision was that the
20   University had decided to hire a full-time faculty member to teach Professor
21   Grossenbach's ethics course instead of an adjunct professor.

22       145.   Professor Grossenbach initially accepted the rationale and
23   departed the University on respectful terms.

24       146.   Later that day, Professor Grossenbach grew skeptical of the
25   University's decision.

26

27

28

147. The University's decision came mid-year, Professor Grossenbach's ethics course was always a required course in high demand by the students, and he had performed well in previous years.

148. Professor Grossenbach's Department leadership had even suggested Professor Grossenbach be assigned additional courses to teach at the University because of his reputation and the demand students had for his classes.

149. Thus, it seemed odd to Professor Grossenbach that he would suddenly be replaced as his scheduled Spring ethics course quickly approached.

150. Suspecting that there was more to the story and that his termination was pretextual, Professor Grossenbach submitted a public records request for documents and emails associated with the University's decision to not renew Professor Grossenbach's teaching contract. A true and correct copy of Professor Grossenbach's public records request is attached hereto as Exhibit L and incorporated herein.

**J.    Defendants engaged in a 239-day campaign of delay and deception intended to obstruct and obscure Professor Grossenbach's ability to ascertain the true grounds for his termination from the University.**

151. On December 2, 2023, Professor Grossenbach provided Defendants with clarifying information regarding his public records request to help narrow the search for his requested records. A true and correct copy of the email correspondence from Professor Grossenbach regarding his public records request is attached hereto as Exhibit M and incorporated herein.

152.   On December 6, 2023, after Defendants failed to respond to Professor Grossenbach's email, he followed up, asking whether they needed more information to help with the search. Exhibit M.

153.   On December 7, 2023, Day 7, Defendants provided Professor Grossenbach the following response:

> Good afternoon,
>
> The University is unable to conduct a search for emails without specific individuals or mailboxes that would contain potentially responsive records. Without knowing which mailboxes to search, we are unable to proceed with processing your request.
>
> We can proceed once that information is provided.
>
> Thank you!

Exhibit M at 5.

154.   Less than three hours later, Professor Grossenbach responded with the three emails associated with the search: schlarer@arizona.edu; ahackett@arizona.edu; and salers@arizona.edu. Exhibit M at 5.

155.   On December 8, 2023, Day 8, Defendants confirmed receipt of the information, but explained that the records request may take longer than ordinary requests.

156.   Shortly thereafter, Professor Grossenbach saw that the University had posted an advertisement soliciting resumes for two adjunct professor positions at the School of Government & Public Policy to teach ethics, which Professor Grossenbach was well qualified to teach and had been teaching prior to his unlawful termination.

157.   This was curious, indeed, because Professor Grossenbach was an adjunct professor teaching ethics at the School of Government and Public

Policy and had been informed that he was terminated due to a desire for a full-time faculty member.

158.    On January 9, 2024, Professor Grossenbach requested an update on his public records request: "In case I missed the response, would you please confirm this request has NOT been completed since it was received 32 days ago?" Exhibit M at 4.

159.    Defendants did not respond to Professor Grossenbach.

160.    Professor Grossenbach discovered that PA330, the ethics course Professor Grossenbach was scheduled to teach in the Spring semester, was no longer being offered to students.

161.    No full-time faculty member was hired to teach Professor Grossenbach's ethics course.

162.    The University's failure to offer the course Professor Grossenbach was slated to teach was especially odd because PA330 "Ethics for the Public Administrator" is a course requirement for graduates of the University's School of Government and Public Policy.

163.    On February 8, 2024, Day 71, Professor Grossenbach emailed Defendants, "Would you please confirm if this request has been denied or if it's still being processed?" Exhibit M at 3-4.

164.    On February 9, 2024, Day 72, Defendants responded:

We hope you are doing well! Thank you for reaching out for an update regarding your request.

We continue to process this request and will provide a response as promptly as circumstances permit.

We understand that your request is important to you and thank you for your patience and understanding.

Have a wonderful day!

The Office of Public Records

Exhibit M at 3.

165.    On March 15, 2024, Day 107, Professor Grossenbach requested another update from Defendants: "Would you please provide an estimated production date? If you can't do that, would you please tell me when similar requests are typically fulfilled? In other words, does it normally take around 3 months or could it be over 3 years? Just curious what kind of extreme limits you have seen in your experience. Thank you." Exhibit M at 2-3.

166.    On March 18, 2024, Day 110, Defendants responded with the following:

> We continue to process your request 2023-0403. Our office has provided the fullest extent of the information available at this time regarding your request. We will provide our response as promptly as possible. We understand that the records are important to you, and we appreciate your patience.

Exhibit M at 2.

167.    On May 20, 2024, Day 173, Professor Grossenbach requested an update, emailing Defendants, "Has this request been denied?" Exhibit M at 2.

168.    That same day, Defendants responded with the following message:

> We hope you are doing well! Thank you for reaching out for an update regarding your request. We continue to process this request and will provide a response as promptly as circumstances permit. We understand that your request is important to you and thank you for your patience and understanding. Have a wonderful day!"

Exhibit M at 1.

169.    On June 20, 2024, Day 203, Defendants emailed Professor Grossenbach the following email: "wish to proceed with your request no. 2023-0403./sic/." A true and correct copy of the email correspondence beginning on June 20, 2024, is attached hereto as Exhibit N and incorporated herein.

170.    Professor Grossenbach responded: "Yes, I wish to proceed with my request no.2023-0403, please confirm receipt of this message." Exhibit N at 1.

171.    Defendants responded, "Thank you so much for your confirmation. Our office continues to process your request. Have a wonderful rest of your day!" Exhibit N at 1.

172.    Needless to say, the rest of Professor Grossenbach's day was not wonderful, as it had been over 200 days since his public records request with no action from Defendants concerning information it has a duty under Arizona law to provide.

173.    Indeed, after 200 days, Defendants had failed to provide a single, substantive update on his request, let alone the public records he was entitled to receive from the University.

174.    After 229 days, Professor Grossenbach retained legal counsel to intervene on his behalf to obtain these requested public records.

175.    On July 16, 2024, Professor Grossenbach's legal counsel sent Defendants a demand letter requesting the public records. A true and correct copy of the demand letter is attached hereto as Exhibit O and incorporated herein.

176.    On July 26, 2024, Day 239, Defendants provided Professor Grossenbach the requested public records. A true and correct copy of the requested records is available electronically at

https://www.goldwaterinstitute.org/wp-content/uploads/2024/08/2023-0403-Responsive-Records.pdf and incorporated herein.

177.    Defendants redacted the records without providing an index of redacted materials.

178.    "If requested, the custodian of the records of an agency shall also furnish an index of records or categories of records that have been withheld and the reasons the records or categories of records have been withheld from the requesting person." A.R.S. § 39-121.03.D.

179.    On October 4, 2024, Professor Grossenbach, through legal counsel, requested Defendants provide an index of redactions. A true and correct copy of the October 2024 correspondence is attached hereto as Exhibit P and incorporated herein.

180.    The furnished public records revealed emails which contain evidence of Defendants' religious discrimination, retaliation, and Professor Grossenbach's unlawful termination from the University.

181.    Aside from the three anonymous complaints attempting to silence Professor Grossenbach's constitutionally protected speech and religious exercise, Professor Grossenbach had no negative performance reviews or any other basis upon which the University could base it termination.

182.    Professor Grossenbach never discussed SaveCFSD with his students.

183.    Because Professor Grossenbach was teaching a public administrator ethics course, he did discuss ongoing public controversies in the news, including the issues surrounding public school boards and other government officials faced with ethical dilemmas, because the course

curriculum was focused on an examination of potential divisive moral issues as a method to clarify moral reasoning in public administrator ethics.

184.   Professor Grossenbach never discussed SaveCFSD in his ethics courses.

185.   Professor Grossenbach never asserted that he represented Defendants at any SaveCFSD events, while speaking on behalf of SaveCFSD at any school board meeting, or while engaging in any manner of protected speech regarding the school board.

186.   Public records revealed that Professor Grossenbach was regarded as a good professor among his students, peers, and leadership.

187.   On April 12, 2022, Professor Grossenbach was deemed a talented adjunct. A true and correct copy of emails from University officials commending Professor Grossenbach are attached hereto as Exhibit Q and incorporated herein.

188.   On April 13, 2022, Angela Hackett sent the following email: "Just thinking out loud on this one – Dan is a good instructor and an SGPP alum so I think we can entertain the idea of a longer commitment to him- even though we cannot offer her a lengthier or attractive contract (only semester to semester like most others)." Exhibit Q at 2.

189.   On April 14, 2022, Professor Grossenbach was considered for teaching in-person and online in the spring, summer, and fall. Exhibit Q at 1.

190.   Thus, Defendants were actively seeking to have Professor Grossenbach teach his courses every semester in-person and online, which is hardly the approach taken towards someone whose performance is questionable.

VERIFIED COMPLAINT
Case No. _____

191.    Despite Professor Grossenbach's performance and positive reputation, Defendants terminated Professor Grossenbach after discovering that he was an outspoken Christian, advocating for change within his local school board to protect his family.

192.    On January 9, 2025, Professor Grossenbach filed a complaint against Defendants with the Arizona Attorney General Office of Civil Rights.

193.    On January 22, 2025, Professor Grossenbach filed a complaint against Defendants with the United States Equal Employment Opportunity Commission (EEOC).

194.    On May 27, 2025, Professor Grossenbach received a Notice of Right to Sue letter from the EEOC. Exhibit 1.

**K.    Even after Defendants effectively terminated Professor Grossenbach, online trolls continued to harass Professor Grossenbach.**

195.    Even after Defendants unlawfully terminated Professor Grossenbach by choosing to not renew his teaching contract, online trolls continued their harassment campaign against Professor Grossenbach and SaveCFSD.

196.    On March 14, 2024, the Pima County Democratic Party posted a photograph of Professor Grossenbach with the caption: "If this group gets a hold of our school board, your property values will plummet." [19]

---

[19] Pima County Democratic Party, *Just so we are all tracking Save CFSD is a seemingly vague group. But their mission is clear: …*, Facebook (March 14, 2024, 2:35 PM), *available at* https://www.facebook.com/pimadems/posts/pfbid0oqeLvTfNL5Jz7iiLanSyrZ 56cumJpczsTRCPBXUMUf2YKS7TM8P5AjA5WLURVpmAl.

197. In September 2024, an anonymous X account engaged in a stalking campaign, following Professor Grossenbach and his family around Arizona, posting vague descriptions of his whereabouts.

198. The stalker even used a picture of Professor Grossenbach's home as his profile picture on the social media website.[20]

199. CFSD furthered its swim into the ever-deepening waters of public controversy.

200. On May 27, 2025, a whistleblower leaked a video of a CFSD 9th grade health teacher ranting about religion, emphasizing that students cannot believe what they hear in church, and then instructing students about the steps of "transitioning" from one gender to another:

> Now the topic that we're dealing with today stems with sexuality as well as LGTQ. A lot of information that we get regarding this discussion comes from our faith. A lot of people have very strong feelings. This group right here has open executions on the streets in some parts of the world where if someone is identified as gay and they find them they catch them. They chop their heads off. That still happens today. So that's telling you that it's a very strong belief that something is wrong or moral. And so, it's critical for us to do our own research rather than just listening to what people tell you. The problem is when we go to houses of worship or we hear from people over time they can definitely influence us and maybe we don't realize it. Now when we look at the different religions of the world these are the different texts the Bible

---

[20] Dan Grossenbach, *1/6 All three CFSD "Students First" school board candidates allow harassment of district parents!* …, X (formerly Twitter) (September 20, 2024, 1:53 AM), *available at* https://x.com/dangrossenbach/status/1837007073411756253.

and Christianity and Quaran and then we got the Torah. And when we have other religious doctrines that many people trust and put their faith in. When we read these it's important to understand that these originated thousands of years ago. … So, when you think of "homosexuality" the word, that word did not come into play until the 1900s. So, it does not appear in the Hebrew Bible and, so forth Lesbianism is not mentioned at all. So, the word homosexuality itself is a modern term and so they had to derive it from the Hebrew Aramaic and Greek. The meaning and application of these passages have been subject to different interpretations throughout history and continue to be debated today. So, if you go to various places of worship and you talk to people that are there to lead their flocks, 50% will probably say it's one way, 50% will say it's the other way. So, if people can't even agree how do we know which one is right you know, but one of the classes, one of the students mentioned last year that their pastor in their church said that anyone who identifies as LGBTQ should be herded up and they should be executed. And then there's some of you that might hear that in your own church your own congregation, your own house of worship. And then there's some of you that might hear that in your own church, your own congregation, your own house of worship, and then there's others that are affirming and accepting and loving. I'm not trying to preach or anything like that, so just understand this is for educational purposes. So, what does the term cisgender mean? It's a new word. So, then we have transgender. Theres different ways you can transition when it comes to your sexuality. So, could you just come out and tell people that you're transgender and you haven't done anything different you've just expressed to people that they, I'm born male but I

identify as female. Would that be one way of doing it all right? So, first is just letting people know. What would be the next step in the process? So, taking more of the feminine name starting to dress female rather than male. Okay, Excellent. What would be the next progression then so then start alterations physically? So, starting out with hormones and then eventually, probably having surgery. Right. The government is saying that children cannot transition. Could your parents make the exception and allow transitioning physically to occur before 18? How do you think most parents are going to feel? Yea, they're probably going to resist it. So, that becomes definitely a challenge. Who do you go to, to talk to if you're one of those that are struggling? If you went to your parents and you told them you were struggling could your parents reject you? You know most parents aren't understanding, aren't accepting, or whatever. And so many teenagers are potentially at risk of STDs and STIs that could potentially cause infertility could lead to an earlier death simply out of fear. One of the students last period mentioned how some of their friends today have been threatened to be kicked out of their homes because of their choices they're making when it comes to sexuality. My encouragement for you is to make sure do you research. Make decisions that you feel are good for you. Don't just base your decisions simply because you've been told something.[21]

201. Defendants' actions chill potential resistance to the school districts unlawful actions. Now, before Professor Grossenbach advocates on

---

[21] ADI Staff Reporter, Catalina Foothills School District Responds to Reports of 9th Grade Lecture on LGBTQ Issues, Arizona Independent News Network (May 31, 2025), *available at* https://arizonadailyindependent.com/2025/05/31/catalina-foothills-school-district-responds-to-reports-of-9th-grade-lecture-on-lgbtq-issues/.

behalf of reforming his local school district, he must first stop and question whether the salvation of his children and his constitutionally protected speech are worth losing his career.

202.   It is inevitable that Defendants' actions have chilled more than just Professor Grossenbach's speech.

**L.   Professor Grossenbach suffered and is suffering irreparable harm, including reputational damage, financial harm, stifled career progression, and missed academic opportunities.**

203.   Defendants have caused and Professor Grossenbach has suffered and continues to suffer reputational damage, due to Defendants' violations of the law, discriminatory acts, and unlawful policies.

204.   Defendants have caused and Professor Grossenbach has suffered and continues to suffer financial damage from lost wages, due to Defendants' violations of the law, discriminatory acts, and unlawful policies.

205.   Defendants have caused and Professor Grossenbach has suffered and continues to suffer from lost academic opportunities, including the opportunity write and publish a textbook that would have furthered Professor Grossenbach's professional and academic career, all due to Defendants' violations of the law, discriminatory acts, and unlawful policies.

206.   Defendants have caused and Professor Grossenbach has suffered and continues to suffer from lost academic opportunities, including the pursuit of a Doctor of Philosophy (Ph.D.) degree at the University, due to Defendants' violations of the law, discriminatory acts, and unlawful policies.

207.   Defendants have caused and Professor Grossenbach has suffered and continues to suffer from stifled career progression at the University, due

1   to Defendants' violations of the law, discriminatory acts, and unlawful
2   policies.

3       208.   Defendants have caused and Professor Grossenbach has suffered
4   and continues to suffer from the public embarrassment of being effectively
5   terminated from his job for his speech, due to Defendants' violations of the
6   law, discriminatory acts, and unlawful policies.

7       209.  Defendants' unlawful termination of Professor Grossenbach
8   imposed irreparable constitutional injury on Professor Grossenbach's
9   protected expression.

10      210.  Defendants' unlawful termination of Professor Grossenbach
11  imposed irreparable constitutional injury on Professor Grossenbach's
12  protected speech.

13      211.  Defendants' unlawful termination of Professor Grossenbach
14  imposed irreparable constitutional injury on Professor Grossenbach's
15  protected religious exercise.

16      212.  Defendants' unlawful denial of Professor Grossenbach's public
17  records request caused injury and damage to Professor Grossenbach.

18  **COUNT I – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS**
19  **ACT OF 1964, 42 U.S.C. §2000e, *et seq*.**

20      213.   Plaintiff hereby realleges and adopts each and every allegation
21  in paragraphs 1 – 212 above as if fully set forth herein.

22      214.   Title VII prohibits discrimination against employees on the basis
23  of religion. 42 U.S.C. §2000e-2(a) ("It shall be an unlawful employment
24  practice for an employer … to fail or refuse to hire or to discharge any
25  individual, otherwise to discriminate against any individual with respect to
26  his compensation, terms, conditions, or privileges of employment because of
27  such individual's race, color, religion, sex, or national origin….").

28

215.    Title VII defines the protected category of religion to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §2000e(j); *See also* EEOC, *Religious Discrimination.*[22]

216.    Moreover, as the EEOC has made clear, Title VII's protections also extend to nonreligious beliefs if related to morality, ultimate ideas about life, purpose, and death. *See* EEOC*, Questions and Answers: Religious Discrimination in the Workplace* (June 7, 2008).[23]

217.    Defendants employ more than 15 employees and are thus subject to Title VII's prohibitions.

218.    Generally, Professor Grossenbach sincerely believes that parents should direct the upbringing of their children. This includes parents' right to information about their children's mental health, and the ability to direct their treatment.

219.    Further, Professor Grossenbach sincerely believes that he has a religious obligation to defend these Biblical principles, which includes speaking in favor of parental rights at the Catalina Foothills School Board meetings.

220.    Professor Grossenbach realleges the more in-depth discussion of his sincerely held religious beliefs in paragraphs 53-67 as if fully set forth herein.

221.    Professor Grossenbach's sincerely held religious beliefs apparently conflict with his employer's practices and requirements, including *inter alia* the University's anti-discrimination and professional conduct policies.

---

[22] Available at https://www.eeoc.gov/religious-discrimination.
[23] Available at https://www.eeoc.gov/laws/guidance/questions-and-answers-religious-discrimination-workplace

222.   Defendants terminated Professor Grossenbach for the exercise of his sincere religious convictions that purportedly violated the University's employment requirements.

223.   Defendants unlawfully discriminated against Professor Grossenbach for his lawful exercise of faith, by terminating him in response to anonymous complaints regarding his constitutionally protected speech, religious expression, and religious exercise.

224.   Defendants' violation of Title VII has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to Professor Grossenbach's sincerely held religious beliefs.

225.   Professor Grossenbach has suffered actual damages as a result of Defendants' violation of Title VII.

226.   As a direct result of Defendants' retaliatory actions, Professor Grossenbach has suffered substantial harm, including the loss of his income, professional opportunities, and reputational harm.

WHEREFORE, Professor Grossenbach respectfully prays for relief against Defendants as hereinafter set forth in their prayer for relief.

**COUNT II – VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

227.   Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1-212 above as if fully set forth herein.

228.   The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's freedom of speech.

229.   The Free Speech Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the state from excluding Professor Grossenbach from government programs and positions

based on his religion, and such "exclusion constitutes viewpoint discrimination." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001).

230. Defendants' policies and practices to select which adjunct professor to terminate, based on their faith, on its face and as applied, unconstitutionally discriminates on the basis of viewpoint.

231. Defendants evaluated the content and viewpoint of Professor Grossenbach's speech to determine whether they would take adverse employment actions against him.

232. Defendants' decision to classify Professor Grossenbach's religious beliefs as an "issue" that needs to be resolved, and Defendants' eventual decision to terminate Professor Grossenbach, were based solely on Professor Grossenbach's religious identity and his constitutionally protected speech.

233. Government efforts to punish speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of speech restriction. *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

234. To the extent Defendants will contend that their conduct was necessitated and/or justified by the University's Nondiscriminatory and Anti-Harassment Policy (HR-200E) or Statement of Professional Conduct (UHAP 7.01), these policies violate the Free Speech Clause on their face and as-applied against Professor Grossenbach by unconstitutionally discriminating against his speech on the basis of content and viewpoint.

235. These policies, on their face and as applied, singled out Professor Grossenbach solely because of his religious beliefs, and subjected him to adverse employment action solely on the basis of his religious beliefs.

236. Defendants' policies, on their face and as applied, unconstitutionally discriminate on the basis of content.

237. Defendants' policies described herein, on their face and as applied, also constitute an impermissible prior restraint on speech in that speech not in conformity with the ideologies held by Defendants, as expressed in these policies, is banned in all contexts.

238. Defendants' policies are not supported by any compelling, legitimate, substantial, or even rational government interests.

239. Defendants' policies, on their face and as applied, are not the least restrictive means of achieving otherwise permissible government interests.

240. Defendants' policies, on their face and as applied, are not narrowly tailored to achieve any such legitimate government interests, even if such interests existed.

241. Defendants' policies, on their face and as applied, lack any rational basis and are irrational and unjustifiable.

242. Defendants' policies, on their face and as applied, have caused, are causing, and will continue to cause irreparable harm and actual and undue damages to Professor Grossenbach's sincerely held religious beliefs.

243. Professor Grossenbach has suffered actual and concrete damages as a result of Defendants' unlawful actions.

244. As a direct result of Defendants' retaliatory actions, Professor Grossenbach has suffered substantial harm, including the loss of his income, professional opportunities, and reputational harm.

WHEREFORE, Professor Grossenbach respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

**COUNT III – VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

245.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-212 above as if fully set forth herein.

246.   The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiff's right to free exercise of religion.

247.   The Free Exercise Clause of the First Amendment, protects against "Penalties on the free exercise of religion." *Carson as next friend of O.C. v. Makin*, 596 U.S. 767, 778 (2022).

248.   The Free Exercise Clause prohibits the government from acting with hostility toward religious beliefs or practices, and it protects against both overt and covert discrimination based on religious status or beliefs. *See Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

249.   "The Free Exercise Clause provides that 'Congress shall make no law… prohibiting the free exercise' of religion." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting U.S. Const. Amdt. 1.) "The Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Id.* (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

250.    Professor Grossenbach realleges the discussion of his sincerely held religious beliefs in paragraphs 53-67 as if fully set forth therein.

251.    Defendants targeted Professor Grossenbach on account of his sincerely held religious beliefs for disparate and discriminatory treatment because Defendants perceived those beliefs to be incompatible or in tension with Defendants' preferred worldview.

252.    To the extent Defendants will contend that their conduct was necessitated and/or justified by the University's Nondiscriminatory and Anti-Harassment Policy (HR-200E) or Statement of Professional Conduct (UHAP 7.01), these policies violate the Free Exercise Clause both on their face and as-applied by singling out religious exercise for discriminatory and unconstitutional speech.

253.    Defendants' policies described herein, on their face and as applied, were neither neutral nor generally applicable.

254.    Defendants' policies described herein, on their face and as applied, specifically targeted Professor Grossenbach's religious beliefs for disparate and discriminatory treatment.

255.    Defendants' policies described herein, on their face and as applied, specifically target religion for disparate and discriminatory treatment.

256.    Defendants' policies described herein, on their face and as applied, imposed a substantial burden on Professor Grossenbach's exercise of his sincerely held religious beliefs during his tenure as a University of Arizona employee and continue to burden current and future Christian employees of the University.

257.    Defendants' policies, on their face and as applied, fail to accommodate Professor Grossenbach's sincerely held religious beliefs.

258.   Defendants' policies described herein are not supported by any compelling, legitimate, substantial, or even rational government interest.

259.   Defendants' policies described herein, on their face and as applied, are not the least restrictive means of achieving an otherwise permissible government interest.

260.   Professor Grossenbach has suffered actual and concrete damages as a result of Defendants' unlawful actions.

261.   As a direct result of Defendants' retaliatory actions, Professor Grossenbach has suffered substantial harm, including the loss of his income, professional opportunities, and reputational harm.

WHEREFORE, Professor Grossenbach respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## COUNT IV – VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (RETALIATION)

262.   Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1 –212 above as if fully set forth herein.

263.   The Free Speech Clause of the First Amendment prohibits government retaliation against persons for engaging in constitutionally protected speech, expression, and conduct.

264.   Professor Grossenbach engaged in constitutionally protected conduct by expressing and maintaining his sincerely held religious beliefs at the Catalina Foothills Schoolboard Meetings and online.

265.   Defendants, acting under the color of state law, retaliated against Professor Grossenbach by terminating his employment.

266.   By punishing Professor Grossenbach for expressing his views regarding parental rights and CFSD's promotion of sexual content and

practices to children, Defendants have retaliated and are retaliating against Professor Grossenbach for exercising his First Amendment rights.

267.   When Professor Grossenbach expressed his views regarding parental rights and CFSD's promotion of sexual content and practices to children, he was speaking on a matter of public concern, engaging in speech related to his faith, morality, children, and the community in which he continues to raise his family.

268.   Professor Grossenbach's interest, that of a concerned citizen's ability to utilize constitutionally protected speech to discuss matters of public concern, outweighs any interest Defendant may claim to have in terminating Professor Grossenbach's employment.

269.   Professor Grossenbach's constitutionally protected speech on matters of public concern never prevented Defendants from efficiently providing services to the public.

270.   Professor Grossenbach's constitutionally protected speech on matters of public concern never interfered with Professor Grossenbach's ability to teach his students.

271.   Defendants' discriminatory and unconstitutional actions taken against Professor Grossenbach would deter a person of ordinary firmness from exercising his right to free speech in the future.

272.   Defendants' discriminatory and unconstitutional actions taken against Professor Grossenbach constitute adverse employment actions.

273.   Defendants took these retaliatory and unconstitutional actions against Professor Grossenbach at least in part because of the views he expressed on matters of public concern that were related to his sincerely held religious beliefs, expression that the First Amendment protects.

274. Defendants subjected Professor Grossenbach to adverse employment action due to the content and viewpoint of Professor Grossenbach's speech, expression, and exercise.

275. Defendants' retaliatory and unconstitutional actions taken against Professor Grossenbach violate his right to free speech as guaranteed by the First Amendment to the United States Constitution.

276. As a direct result of Defendants' retaliatory actions, Professor Grossenbach has suffered substantial harm, including the loss of his income, professional opportunities, and reputational harm.

277. To the extent Defendants will contend that their conduct was necessitated and/or justified by the University's Nondiscriminatory and Anti-Harassment Policy (HR-200E) or Statement of Professional Conduct (UHAP 7.01), Plaintiff asserts that these policies violate the Free Speech Clause.

278. Defendants' policies, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

279. Defendants' policies, on their face and as applied, unconstitutionally discriminate on the basis of content.

280. Defendants' policies, on their face and as applied, singles out Plaintiff solely because of his religious beliefs and expression to be subjected to adverse action solely on the basis of his religious beliefs and expression.

281. Defendants' policies, on their face and as applied, are not supported by any compelling, legitimate, substantial, or even rational government interest.

282. Defendants' policies, on their face and as applied, are not the least restrictive means of achieving an otherwise permissible government interest.

283. Defendants' policies, on their face and as applied, are not narrowly tailored to achieve any such legitimate interest, even if it existed.

284. Defendants' policies, on their face and as applied, lack any rational basis and are irrational and unjustifiable.

285. Defendants' policies, on their face and as applied, have caused, are causing, and will continue to cause irreparable harm and actual and undue hardship on Christian employees at the University of Arizona and impermissibly burden the expression of their sincerely held religious beliefs.

286. As a direct result of Defendants' retaliatory actions, Professor Grossenbach has suffered substantial harm, including the loss of his income, professional opportunities, and reputational harm.

WHEREFORE, Professor Grossenbach respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

## COUNT V – VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

287. Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1 – 212 above as if fully set forth herein.

288. The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the right to equal protection under the law.

289. "The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the law,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

290. The Equal Protection Clause prohibits discrimination on the basis of religion.

291.   Defendants' termination of Professor Grossenbach on the basis of his sincerely held religious beliefs and expression singled him out for selective, disparate, and discriminatory treatment.

292.   Defendants' termination of Professor Grossenbach on the basis of his sincerely held religious beliefs and expression violated the Equal Protection Clause.

293.   Defendants' termination of Professor Grossenbach on the basis of his sincerely held religious beliefs and expression was explicitly intended to inhibit and punish the exercise of Plaintiff's sincerely held religious beliefs and expression.

294.   To the extent Defendants will contend that their conduct was necessitated and/or justified by the University's Nondiscriminatory and Anti-Harassment Policy (HR-200E) or Statement of Professional Conduct (UHAP 7.01), these policies, on their face and as applied, violates the Equal Protection Clause of the Fourteenth Amendment by discriminatory treating Professor Grossenbach dissimilarly to similarly situated employees solely on the basis of his sincerely held religious beliefs and expression.

295.   Defendants' policies, on their face and as applied by Defendants, are an unconstitutional abridgment of Professor Grossenbach's right to equal protection under the law, are not neutral, and specifically target Professor Grossenbach's sincerely held religious beliefs and expression for discriminatory and unequal treatment.

296.   Defendants' policies, on their face and as applied by Defendants, are an unconstitutional abridgment of Professor Grossenbach's right to equal protection because they permit Defendants to treat Plaintiff differently from other similarly situated employees on the basis of Professor Grossenbach's sincerely held religious beliefs and expression.

297.   Defendants' policies, on their faith and as applied by Defendants, single out Professor Grossenbach and other persons who hold fast to Biblical worldview for selective and discriminatory treatment based upon their sincerely held religious beliefs and expression.

298.   Defendants' policies, on their face and as applied, are not supported by any compelling, legitimate, substantial, or even rational government interest.

299.   Defendants' policies, on their face and as applied, are not the least restrictive means of achieving an otherwise permissible government interest.

300.   Defendants' policies, on their face and as applied, have caused and are continuing to cause irreparable harm and actual and undue hardship on current University of Arizona employees and other employees employed by organizations under the management of the Arizona Board of Regents with sincerely held religious beliefs similar to Professor Grossenbach's beliefs.

301.   As a direct result of Defendants' retaliatory actions, Professor Grossenbach has suffered substantial harm, including the loss of his income, professional opportunities, and reputational harm.

WHEREFORE, Professor Grossenbach respectfully prays for relief against Defendants as hereinafter set forth in her prayer for relief.

**COUNT VI – VIOLATION OF ARIZONA REVISED STATUTE §39-121.01 WRONGFUL DENIAL OF ACCESS TO PUBLIC RECORDS.**

302.   Plaintiff hereby realleges and adopts each and every allegation in paragraphs 1 – 212 above as if fully set forth herein.

303.   Arizona requires that "[a]ll officers and public bodies … maintain all records, including records as defined in §41-151, reasonably necessary or appropriate to maintain an accurate knowledge of their official activities and

1  of any of their activities that are supported by monies from this state or any
2  political subdivision of this state." A.R.S. §39-121.01B.

3      304.   "Any person may request to examine or be furnished a copies,
4  printouts or photographs of any public record during regular office hours or
5  may request that the custodian mail a copy of any public record not otherwise
6  available on the public body's website to the requesting person." A.R.S. §39-
7  121.01D1. "If requested, the custodian of the records of any agency shall also
8  furnish an index of records or categories of records that have been withheld
9  and the reasons the records or categories of records have been withheld from
10 the requesting person." A.R.S. §39-121.01D2.

11     305.   "Access to a public record is deemed denied if a custodian fails to
12 promptly respond to a request for production of a public record or fails to
13 provide to the requesting person an index of records or categories of records
14 that are withheld from production pursuant to subsection D, paragraph 2 of
15 this section." A.R.S. §39-121.01E.

16     306.   "Any person who is wrongfully denied access to public records
17 pursuant to this article has a cause of action against the officer or public body
18 for any damages resulting from the denial." A.R.S. §39-121.02C.

19     307.   "Unlike public information statutes in some other jurisdictions,
20 Arizona's statute specifies that when records are subject to disclosure the
21 required response is the prompt and actual production of the documents."
22 *Phoenix New Times, L.L.C. v. Arpaio*, 217 Ariz. 533, 538 (Ct. App. 2008).
23 Prompt has been defined as "quick to act," *West Valley Inc. v. Maricopa*
24 *County Sheriff's Office*, 216 Ariz. 225, 230 (App. 2007), and "producing the
25 requested records 'without delay," *Phoenix New Times, L.L.C.*, 217 Ariz. at
26 538 (quoting *West Valley Inc.*, 216 Ariz. at 230.).

27
28

308. The burden is on the State to establish that responses to Professor Grossenbach's requests were prompt, "given the circumstances surrounding each request," and that the State adequately searched for the requested records. *Id.* at 538-539.

309. In Arizona, Courts have determined that public records produced 49 days, 77 days, 97 days, and 100 days are not considered to have been "promptly" furnished to the requester. *Phoenix New Times, L.L.C. v. Arpaio*, 217 Ariz. 533 (Ct. App. 2008).

310. Defendants unlawfully denied Professor Grossenbach access to public records by failing to respond to his public records request for 239 days.

311. Defendants unlawfully denied Professor Grossenbach access to public records by failing to provide Professor Grossenbach sufficient justification for their delay.

312. Defendants unlawfully denied Professor Grossenbach access to public records by failing to describe the redactions throughout public records produced to Professor Grossenbach.

313. Defendants' violation of A.R.S. §39-121.01 has caused, is causing, and will continue to cause Professor Grossenbach irreparable harm.

314. Defendants' violation of A.R.S. §39-121.01 prevented Professor Grossenbach from timely discovery of Defendants' unlawful acts, including their effective termination of Professor Grossenbach for his protected speech and faith.

315. As a direct result of Defendants' retaliatory actions, Professor Grossenbach has suffered substantial harm, including the loss of his income, professional opportunities, and reputational harm.

WHEREFORE, Professor Grossenbach respectfully prays for relief against Defendants as hereinafter set forth in their prayer for relief.

VERIFIED COMPLAINT
Case No. _____

# PRAYER FOR RELIEF

WHEREFORE, Professor Grossenbach respectfully prays for relief against Defendants as follows:

A.    That the Court issue a Permanent Injunction upon judgement, restraining and enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the University's Nondiscriminatory and Anti-Harassment Policy (HR-200E) and Statement of Professional Conduct (UHAP 7.01), and compelling Defendants to reasonably accommodate the religious beliefs and practices of its employees in accordance with the mandates of Title VII as elucidated by the United States Supreme Court in *Groff v. DeJoy*, 600 U.S. 447, 457 (2023);

B.    That the Court render a declaratory judgment declaring that Defendants' termination of Plaintiff's employment was unconstitutional and unlawful, and further declaring –

(1)    That Defendants intentionally discriminated against Plaintiff's sincerely held religious beliefs and expression by terminating him on the basis of his religious beliefs, speech, and expression; and

(2)    That Defendants intentionally and unlawfully discriminated against Plaintiff in violation of Title VII terminating him on the basis of his religious beliefs, expression, and exercise, and by refusing to engage in the interactive accommodation process to accommodate Plaintiff's religious beliefs;

C.    That the Court render a declaratory judgment declaring the University's Nondiscriminatory and Anti-Harassment Policy (HR-200E) and

Statement of Professional Conduct (UHAP 7.01), illegal and unlawful in that they purport to remove federal civil rights and constitutional protections from Plaintiff and other employees of the University, and further declaring

(1)    Defendants' policies, both on their face and as applied, violate the First Amendment to the United States Constitution by specifically targeting Plaintiff's sincerely held religious beliefs for disparate and discriminatory treatment;

(2)    Defendants' policies, both on their face and as applied, violate the First Amendment to the United States Constitution by singling out Plaintiff's religious viewpoint, content, and expression for discriminatory treatment;

(3)    Defendants' policies, both on their face and as applied, violate the First Amendment to the United States Constitution by attempting to compel speech that violates the speaker's sincerely held religious beliefs and conscience;

(4)    Defendants' policies, both on their face and as applied, violate the First Amendment to the United States Constitution in that it constitutes a prior restraint on speech borne out of sincerely held religious beliefs; and

(5)    Defendants' policies, both on their face and as applied, violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by codifying into law a preference for employees with specific religious beliefs;

D.    That the Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

E.    That the Court restore Plaintiff to the status quo ante – that is, reinstate Plaintiff to his prior position of employment and restore all benefits appurtenant thereto;

F.    That the Court award Plaintiff backpay and other actual damages in an amount to be determined at trial;

G.    That this Court award punitive damages;

H.    That the Court award Plaintiff his reasonable attorney's fees, costs, and other expenses and disbursements in this action 42 U.S.C. §1988, and as otherwise allowed by law;

H.    That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order; and

I.    That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

J.    Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Daniel J. Schmid
Mathew D. Staver**
Horatio G. Mihet**
Daniel J. Schmid*
Avery B. Hill*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org
ahill@lc.org
*Attorneys for Plaintiffs*
**Motions for Admission *pro hac vice* forthcoming

*Admitted *pro hac vice*

66
VERIFIED COMPLAINT
Case No. _____

## **VERIFICATION**

I, Daniel Grossenbach, am over the age of eighteen years and the plaintiff in this action. The statements and allegations that pertain to me or which I make in this Verified Complaint are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury of the laws of the United States and the State of Arizona that the foregoing statements are true and correct to the best of my knowledge.

Dated this 20th day of August, 2025

/s/ Daniel Grossenbach